It sounds like counsel for appellants will be splitting time. Yes, Your Honor, if our plan is I'll argue for eight minutes, we'll save four minutes for rebuttal to each and then Ms. Richardson-Brayer will argue for eight minutes. Okay, so you each want to have rebuttal? Yeah, I think that's the plan. That's fine. Okay, please proceed. Okay, thank you, Your Honor. May it please the Court, I'm Karen Landau and I represent Robert Manning. My client came back to the Heritage Center armed, but he didn't shoot anyone. He moved past the scene and he never even drew his gun. And on these facts, we have insufficient evidence to sustain his by-car murder conviction because there's insufficient evidence of murder under California law. In particular, there's insufficient evidence of malice of forethought, which is a required element of murder. Now, I think it's important to recognize that previously, California, in cases like this where we're talking about really implied malice, although I know the government addresses expressed malice, too, and I'll get to that if the Court's interested. Previously under California law, the local prosecutors primarily relied on what's called the natural and probable consequences argument, which is really if you did anything that created a danger, you could be responsible as long as the murder was foreseeable, reasonably foreseeable. That's not the law in California anymore. The law requires more. For implied malice, an aider and abetter can only be convicted of murder if he personally has expressed or implied malice and if he commits an act that has a high probability of causing death. It's not enough to create a dangerous situation. Here, Mr. Manning, at most, did that. He created a dangerous situation. He left a scene where an armed man confronted his cousin with a gun, threatened him, and he went and he and the shooter in this case, Sean Harrison, went back to the car, they got guns, they came back. But then they didn't shoot first. But what they did do in watching the video is go right to Simmons and not listen to the people who were trying to get them not to do it. They did do that, although I would point out the fact that they did. But on the other hand, to actually go confront this guy, doesn't that suggest that they were... I don't know that they actually confronted this guy. They wanted to go back to the party. But they didn't just go to the party. They didn't just go to the party. That's the point. I'm sorry. They did not just go to the party. No, they tried to. They didn't have a chance. They got shot at first. But they went directly to him. Well, no, they... He was outside. He was outside, but he was by the doors. So they couldn't get in back to the party unless they went that way.  Yeah. So, and he's out there and he, again, he fired first. He fired. He shot Sean Harrison. Sean Harrison returned fire. Meanwhile, my client is gone. He's gone past the scene. He's north on Fillmore Street. I don't know if you know Fillmore Street, but he's north on Fillmore Street. He's... And, you know, and the next they see him is when he gets dropped off. Somebody had obviously picked him up because he gets dropped off at his car in the McDonald's parking lot. I think the main case that supports this argument is the California Supreme Court case of People v. Reyes. That's cited in the briefs. It's... It is important because it talks about what is required to be an implied... What's required to be a direct aider and a better on a theory of implied malice. And that's what we have here. Another critical point is in these cases... I'm sorry, Your Honor, were you going to ask... You looked like you were going to say something. No, please go ahead. All right. I wear that expression perpetually. Well, okay. So, another... Oh, I'm getting low on time. So, actually, I have a few minutes. So, I will move to the mutual combat issue and talk about that a little bit. In the brief, I argued that mutual combat instruction was legally confusing because it conflated... It said you could have mutual combat if you have a preexisting intent to agree... If you agree to start or continue the fight. And by using that continue the fight language, it essentially negated self-defense. If the jury found that... If the jury found that self-defense began with Mr... The rights of self-defense began when Mr. Simmons pulled out his gun and threatened pointed it at, waved it at them, then if they agreed to continue by coming back, that negated self-defense. Is this an argument that the instruction is just legally erroneous as written? I think it's twofold. I think it's inappropriate on the facts of this case and it's legally erroneous, yes. Was a legally erroneous argument made to the district court? It was not. Well, they argued in the sense that it shouldn't have been given because it was not applicable on the facts, but the claim about the validity, about the correctness of giving the instruction was made. So I think the claim was made even if the precise legal argument was not. And that makes it not plain error review. The other point about this instruction is that if you look at California cases where it's given, in this kind of context, there is something more. There is something more than just people who got into a fight and then they continued the fight. You have pre-existing, you have evidence, for example, in Nguyen of pre-existing gang rivalries. You don't have that. We don't know who Simmons was. We don't know what he intended except that he was aggressive and armed. And on those facts, it essentially, by giving this instruction, it deprived the defense of their self-defense defense. I noticed in the transcript that at one point the district judge, in rejecting this argument, misquoted what Simmons said. Simmons said something like, I'm going to air out if you don't keep playing me, something like that. He said something to the effect of, and I'm not, something that if you, if y'all, and I won't use the N-word, keep playing with me, I'm going to air it out. Right. And the district judge, in rejecting the argument, characterized what he said as, let's go outside and air it out, something like that. No, he didn't say that. Which he didn't say. No, he didn't. So to me, the real problem with the mutual combat is really, where are you getting Simmons' agreement from? Well, exactly. That's right. And in addition, there is no, you know, I think the government would have had a stronger argument if, for example, they had shown that Simmons was a member of a known rival gang. But they didn't. Simmons wasn't, and believe me, I'm sure that if they'd had evidence, they would have presented it. So I think it's safe to say that Simmons wasn't a member of Page Street, and Simmons also was not a member of the other gang that, about which Johnny Brown had testified, that the, which is called Eddie Rock. You know, Your Honor, I, if there's more questions, I'm happy to answer them. Otherwise, I'll save my two minutes for rebuttal and turn it over to Ms. Richardson-Royer. Okay. Yeah. Thank you. Good morning. Good morning, Your Honors. I'm just doing the math about when I should stop. Let me just ask Ms. Robinson to please set the clock for ten minutes. That way, you'll be able to keep track of it. Thank you. Sure. Thank you. May it please the Court, Elizabeth Richardson-Royer on behalf of Jamari Coates. This appeal raises a number of issues, several of which concern the District Court's treatment of what I call enterprise evidence, or evidence concerning Mack Block and Mr. Coates and Mr. And this morning, I plan to briefly address two of those issues. First, the insufficiency of the admissible evidence to show that Mr. Coates shot at Mr. D. Simmons for the purpose, for the substantial purpose, of increasing or maintaining his position in a racketeering enterprise. And second, the District Court's erroneous conclusion that it lacked authority to bifurcate the trial into one phase concerning whether a murder occurred and another phase concerning the remaining elements of Vicar murder. But I want to start at the top by talking about the limiting instructions given in this case because they matter for both of these claims. So the District Court in this case severely circumscribed the evidence that the jury was allowed to consider to reach a determination about the intent and purpose of the murder. So the District Court told the jury it could not consider any of Johnny Brown's testimony. So all of Johnny Brown's testimony about the nature of his own gang and, by extension, Mack Block couldn't be considered for this reason. Sergeant Moran's testimony about Mack Block and the members in it and his experience with that gang couldn't be considered for intent or purpose. The racketeering acts, the specific five racketeering acts, could not be considered to determine whether Mr. Coates acted with an enterprise purpose. And so what we're left with is the surveillance video, which shows the conflict. It shows Mr. Coates, Manning, and Harrison returning to the Heritage Center. It shows Mr. Simmons shooting at them and Mr. Harrison and Mr. Coates returning fire. The videos don't have any information about Mack Block. And so we're left with then Mr. Harrison's testimony, which talks about Mack Block as a neighborhood, talks about how some members committed violence, some didn't, that it wasn't required, there's nothing in his testimony about having to retaliate. And so that's what the jury had before it as admissible evidence, and it was simply insufficient. And I think... As to what? As to the enterprise or as to the purpose of the defendants or what? In the briefing, I discussed both, that Mack Block was an enterprise, but here I'm focusing on what I think is the much easier question, which is whether Mr. Coates acted with an enterprise purpose when he returned fire. Because that's the question on which all of this evidence was excluded. And so that's the question on which there was so little admissible evidence concerning Mack Block. And I think the evidence was insufficient and the fact that he was found guilty anyway just shows that the jury was completely unable to divide the evidence in the way that the district court was asking it to do. And the district court knew that the jury was going to have a hard time doing that. And that leads me to the second claim that I wanted to discuss, which is the bifurcation claim. Judge Alsup knew that the jury was not going to be able to put all this gang evidence out of its mind. And so what he wanted to do was divide into two phases the trial, which he attempted to do through the order of presentation, but by the time the jury had to reach its decision, it had all of the evidence before it. And the jury had a question about, you know, they asked for the limiting instruction to be repeated. The jury was concerned that it might not be able to do what the judge was asking it to do as well. And there was no reason that the court couldn't have bifurcated the trial in this way. And his decision to the contrary was a misunderstanding of United States v. Barker, which did not preclude bifurcation in this case. And he felt that his hands were tied by that decision, which they weren't. And if he had bifurcated the trial in that way— Do you want to explain why? Certainly, Your Honor. So Barker concerned a 922G charge. And the reason that the court in Barker held that bifurcation couldn't occur in that case was for essentially two reasons. One was because it felt that it would deprive the government of its ability to present evidence on all of the elements. I don't understand that. That seems totally circular. I mean, I don't understand that explanation. The explanation is that the government should be able to present evidence on matters that turn out not to matter if we bifurcate it. Why does the government have a right to—I didn't understand it. Have you seen any explanation of this? I agree, Your Honor. I don't understand it either. And I think, you know, so the other piece was nullification, which also doesn't apply. But in terms of the government's right to present evidence on everything, that—Barker was decided before Old Chief. And I think that Old Chief really undercut that part of Barker, where, you know, the Ninth Circuit decision at Old Chief, which the Supreme Court overturned, relied on Barker and its progeny to say, really, we can't accept stipulations to a felon status because the government has the right to present evidence on all of the elements of his case. And, you know, Old Chief disagreed. And so I think that Old Chief really undercuts that rationale of Barker. And then you have the jury nullification piece, which doesn't apply here because you're asking the jury to consider whether all of the elements of murder have been proven. There is no risk of jury nullification if you bifurcate it. How do you—how was this going to be bifurcated? What was going to be in Phase 1 and what was going to be in Phase 2? I think that the court, you know, delineated the two phases of trial but did not ask for a jury verdict in the middle. But what do you propose should have been done in a hypothetical Phase 1 and what was supposed to be reserved for a second follow-on proceeding if there was a guilty verdict in Phase 1? So where the court divided it, I think, is the appropriate place. So when the court gave its limiting instruction, that was the dividing line. And everything that happened before then had to do with the events at the Heritage Center on the night of the offense. And all of the video surveillance came in. Harrison's testimony came in. All of the evidence about that night and what happened came in. And then the judge basically cut that off and said, now we're going to hear about the enterprise evidence and you can't consider it for integrity. But in your hypothetical Phase 1, would Vicar Purpose be adjudicated, be tried in Phase 1? No, Your Honor. So we would try just the murder. Under California law, we would have the jury decide whether the elements of murder had been proven. And if they found that there had been a murder under California law, then we would consider the additional three Vicar murder elements in the second phase, which is what the judge wanted to do and felt he was unable to do. And his reason for not doing it was based on an erroneous conclusion of law. I guess I'm having trouble seeing why it's erroneous under Barker. Well, Barker deals with a totally different statute. And so I think, you know, when you have a statute where the only thing that criminalizes the possession of a firearm is the status as a felon, then you really do run the risk of jury nullification if you try the possession. That piece of Barker, I think everyone agrees, is kind of not in play here. But there's another piece of it which goes to whether you're essentially redefining the offense that's been drafted by Congress. And I think the concern with your position is that you're essentially breaking into two, a statute that is the sum of its parts. Well, I think that, you know, that is the other piece of Barker. But respectfully, I think that there are ways to deal with that. And so one of the ways was proposed by the Second Circuit in a case that I cited in the where the court proposed perhaps we have just, you know, the evidence of the RICO predicates and then we have a special interrogatory in the middle where we find, we discover whether the jury finds that these predicates have been proven. And if so, then we move on. And so maybe at the end you still have a general verdict, but you can deal with it through special interrogatories in the middle that then reduce the risk that the jury returns a guilty verdict on murder because of this deeply prejudicial gang evidence, that it isn't relevant to those elements. Is some of this not relevant to just the circumstances of how the murder took place and perhaps the motive? In other words, how would you try the first part of this without any knowledge really of who these people were and why they were together? Well, I think, you know, one of the things that's interesting about this case is the district court's circumscription of the evidence that goes to intent and purpose because the court said that none of the enterprise evidence could be considered for that anyway. And so whether that was legally necessary, I don't take a position on. But in this case, that evidence wasn't admissible on intent. So you don't need it. You can't have it. It's irrelevant. As to Barker, is there — I think Barker itself cited cases from other circuits, but they were all felon and possession cases. Is that right? That's correct, Your Honor. Is there any — I tried to find whether there was any instance in which Barker had been applied outside of felon and possession. Do you know of any? I couldn't — I don't remember a case like that. I will reserve the rest of my time. Yeah, we'll put two minutes on the clock when you return. Thank you, Your Honor. Good morning. May it please the Court, Annie Hsieh for the United States. I will start with the points that my friends on the other side began with, which is insufficiency of the evidence and then bifurcation, and then I'll move on to the other issues should the Court have questions. With regard to the evidentiary sufficiency challenges, I think the bottom line is that both appellants are misapplying the legal standard here. They're asking the Court to essentially not view the evidence in the light most favorable to the prosecution, but in the light most favorable to their theories. And the second step under Nevels and Jackson is determining whether viewing it in the light most favorable to the prosecution, whether any trier of fact could have found the essential elements of the crime met. With regard to Mr. Manning's arguments regarding the insufficiency of evidence of malice aforethought under California law, the government did argue and prove here the elements of both express and implied malice. I think the bottom line is the jury could have found from the facts here the concerted action of Manning and his co-defendant, as well as Mr. Harrison, that when he returned, when he responded to Mr. Simmons' disrespect by tapping on Mr. Harrison's shoulder, sprinting out of the Heritage Center to their cars, grabbing their weapons, and then returning to the scene. And again, it's not just they were returning to the party. They were clearly pushing past these SVIP workers who were trying to stop Mr. Manning and telling him everything is cool, just calm down. There was plenty of evidence from Mr. Harrison that Mr. Manning throughout this entire time was clearly very upset. And the words that he used was, if that dude whipped out on me, which both Mr. Brown and Harrison explained meant brandishing his weapon. So he's clearly triggered by the disrespect here by Mr. Simmons. I'm sorry. Who was brandishing his weapon? Mr. Simmons. I see. Okay. Yes, Your Honor. From these facts, a jury, a rational juror, could absolutely infer that he either, when he returned, had the intent to kill Simmons, or he had those four elements for implied malice, that his actions had a natural and probable cause of creating a dangerous situation and that he had a deliberately disregard for this risk to human life that he was creating. By returning to an armed man who had just threatened him with more weapons. With regard to Mr. Coates' challenge regarding the vicar purpose, I think it's important to see here that there's essentially two categories of evidence from which the rational jury could find that essentially the vicar purpose existed here. What about the mutual combat instruction? The mutual combat, yes. Yes, Your Honor. I can move to that. So, first of all, as far as Judge Brest's question regarding whether or not this was raised properly to preserve it for an abuse of discretion, harmless error review, it was not. I think Rule 30 is clear that you have to raise, with adequate specificity, your objection to instruction before the jury rests. But the question whether it should have been given was certainly raised. Absolutely, Your Honor. Yes. So I think as far as whether or not it should be given, whether or not it's supported by the evidence, is one question that the Court certainly should review for abuse of discretion. And based off of the evidence here, there was evidence of a mutual combat situation. You had Mr. Simmons making the statement. He said, if you don't stop playing with me, I'll air it out, which Harrison testified meant I'm going to start shooting. And the response at that point, it was essentially an offer to fight. And a rational juror could infer that Manning and Coase and Harrison accepted that agreement when they ran back to their cars, retrieved their weapons, and returned back to actually confront Mr. Simmons. Was there any evidence about what, if you don't stop playing with me, meant? Yes, Your Honor. Mr. Harrison testified. I suppose maybe not as far as those particular words. He explained what it meant, what Mr. Simmons meant to air it out. He said that that was disrespectful and threatening. And a rational juror could perceive a very blatant threat like that with the brandishing of a weapon as essentially an invitation to fight, especially when you look at the enterprise functioning and the expectations that the defendants and other MacBlock members had as members of MacBlock, that when you were confronted with disrespect like this, when someone whipped out a weapon or disrespected you in this sort of way, the expectation as a MacBlock member was to retaliate with violence. But I still don't really understand where Mr. Simmons' agreement to a gunfight with these people comes from. He said, if you don't stop playing with me, I'll air it out. He didn't say, I'm agreeing to have you come back with guns and we'll have a gunfight. Your Honor, the statement, if you don't stop playing with me, I'll air it out, could also have been construed by the defense here as if we keep playing with him or messing with him or whatever, if we continue this altercation with him, this verbal altercation, a shooting will occur. My understanding of the mutual combat is he has to agree to have a combat with them as well as them having to agree to have a combat with him. Yes, Your Honor. It has to be an agreement, but it can be expressed or implied. Okay. And is he agreeing to have them come back with guns and shoot him? He made a very clear threat that if they came back, he would start shooting. He would start shooting, but not that he was agreeing that they could then start shooting too. This all comes from a duel, as I understand, from duels, right, where everybody agrees that both people are going to be in combat. What is the evidence that Simmons agreed that they could attack him? Your Honor, the evidence, there was very slim evidence about Simmons before the jury, largely because it was precluded by defense motions at trial. Simmons was, and this was not before the jury, of course, a gang member. What was before the jury, however, was the fact that Simmons was standing there with three or four other men around him. They were having a verbal altercation, a very visible one, with four other members of the MacBlock gang, either members or associates. And Simmons made a very clear threat to them and pulled out a weapon. And so I think the question really is, is this enough to actually give rise to a mutual combat instruction? And I think it is. It's not a very high standard. A rational juror could infer from this situation that this was indeed a gang shootout situation, that you had outsiders in MacBlock territory making threats to MacBlock members, and they responded to a very express threat by returning with their weapons and engaging in a gunfight. Now, I wanted to move next to the bifurcation question, because I realize the Court has probably a number of questions about that. So I would say, first of all, I think Barker seems fairly clear that a bifurcation in this case would have been legal error. So really, the question— Has Barker ever been applied outside as a felony? Your Honor, there has never been a case in which the elements of a single crime have been bifurcated in a Federal trial. I think the most recent case to have conducted a survey of this actually came from a Maryland case from 2019, Hemming v. State, 469 Maryland 219. And that court also stated, Our research reveals no Federal precedent that authorizes this sort of bifurcated trial procedure. And then it goes on. And several of these cases since Barker—again, Barker's from several decades ago at this point— but every circuit, and I think I've seen at least six or seven circuits, including the Ninth Circuit, have held that this sort of bifurcation would be error. And so I think the question really is, is there still discretion to do it? There are some circuits, such as—I think the Second Circuit has said there might be very, very extraordinary circumstances in which you might be able to bifurcate in this sort of way. But by and large, in general, this would be legal error. Can you explain to me—and I just may be really missing something— this concern that the government isn't going to get to put on evidence about an element that may be unnecessary to put on evidence about? Well, I think it's— First of all, just to start, Barker was going to have a stipulation. So it's a different situation, because in either instance, there wasn't going to—whichever way the first prong went out, there wasn't—the issue wasn't going to get to the jury as to the felony conviction. And it seems to me a lot of the comments in Barker were about that. That is, it wasn't going to get to the jury. But here, both pieces are getting to the jury. So what's the concern? Well, I think the concern is twofold. And it's not just about the government's presentation of the evidence, but it is also about— Just a positive, though. My understanding is that they would not necessarily both get to the jury, the theory being that you would try the murder first, and if there was an acquittal on that, that it wouldn't proceed. Am I— Yes, Your Honor. Right. But why does the government have some vested interest in trying something that turns out to be unnecessary because it's no longer at issue? Well, I think, one, I think it's largely a structural concern, right? This is a statute that Congress has written and prescribed certain elements to it. The government has an obligation to prove those elements beyond a reasonable doubt. And so in addition to that, the jury also is supposed to deliberate on that entire offense with all its elements and find whether or not the government has proven it beyond a reasonable doubt. And so what we're inviting here with this process is something I think that's — that is problematic. In addition to essentially cutting the government's ability to present its case and meet its burden with regard to any single count, you have — you're getting into jury deliberations to ask the jury to stop in the middle of the trial or however it looks like and make half a finding on a part of an offense rather than whether or not there is guilt or innocence based off of all the evidence before it of those elements. It's just something that, one, there's no precedent for, and two, I think invites a number of issues even outside of the 922g context. You mentioned earlier that there may be some situations where a court has discretion. Is that like an Erlinger-type situation? Or what would be the types of situations in which there is discretion? So, Your Honor, I think bifurcation, that idea obviously reaches to a number of different areas. And so as my colleague, Mr. Coates' counsel, has pointed out, bifurcation does occur when it comes to separating different accounts that are in an indictment into different trials. We, in capital phases, separate the guilt phase from the sentencing phase. We often have a separate finding when there's a sentencing enhancement from the guilt phase. So there's a number of situations in which bifurcation of a case, which is defined as having the same jury look at different pieces of a trial, is permitted. What is not permitted under all the existing case law and all the circuits right now is bifurcating a single count and separating its elements into separate proceedings. Now, understandably, the district court was concerned about the prejudice problem that defendants kept raising. And so the district court essentially asked the government, present it in essentially what looked like a bifurcated manner. Present the evidence of the murder first, and then you can present your bifurcated purpose after that. And the government did, indeed, do that. The problem here, and I don't know enough about these trials to know whether this is usual, that is that the way they were proving the enterprise crimes, or to show that there was an enterprise, was using crimes that these same defendants committed. I mean, that isn't, some of them weren't. I mean, I think this robbery of the marijuana thing, these people, the defendants were not involved, as I understand it. That seems to me to be a different problem. But when you're using the actual crimes as the enterprise crimes, the crimes that the same people committed, you're essentially, and this was the problem here, you're running into intent and purpose and 404B. And, in fact, the government ended up running into it itself. It was using that evidence that the judge said that it could use in its closing argument. It just seemed, for intent and purpose purposes, it's very hard to keep them apart when that's the case. Now, I have no idea whether there are other cases, this is true in this run of cases in general, and in which there's a particular problem as to the prior actions of the government. Your Honor, and I completely understand the concern here, I think this is something that exists in essentially any RICO and VICAR case. Because what the government has to prove in those cases is four elements, essentially, when it comes to the VICAR offense, which is the existence of the enterprise, the enterprise engages in racketeering activity, that there was a VICAR crime committed, in this case it was murder, and that it was for a VICAR purpose. And then it was what, I'm sorry? What's the fourth? The fourth is the VICAR purpose, I'm using a shorthand for the purpose of the incident. But you don't have to prove the first two through the same people. You do not necessarily, Your Honor, but you can. And I think Banks is a great case that shows this, Rodriguez. I mean, all this case, all this Court's cases on VICAR murder and RICO shows that perpetually, in order to prove the enterprise, and again, here an association, in fact, enterprise has three elements that the Supreme Court has stated, and that's that you have to have purpose, you have to have, I'm sorry, you have to have, there's essentially three structural elements, and they are purpose, the relationships between those individuals, and the longevity. And so to prove that, if you only had, for example, a RICO enterprise in which the particular defendants had not committed anything in the past, you would have to rely on acts by other people. If you had a RICO enterprise in which, you know, to show that longevity piece, for example, you only had incidents in which those very members had been committing prior racketeering acts, that might be the evidence that you have in order to prove that racketeering enterprise. There were limiting instructions that were given about the Enterprise Act's evidence and how it was not to be used for purpose. I think Ms. Richardson-Royer didn't take a position on whether those were necessary, but in the government's view, were those excessive? It went above and beyond what the law requires, Your Honor. Okay. Why do you say that? I would say just based off of banks is a very clear case in which that is a proper use in order to infer from the proof of the enterprise. Essentially, you — so what was — what occurred here, what the district court stated, was that you can't consider these enterprise acts or John A. Brown's testimony, for example, for the intent and purpose elements of Mr. D. Simmons' murder. What you could consider it for was the existence of an enterprise. You can consider it for the functioning of the enterprise. So, again, that comes with how, you know, how this enterprise operates and what its expectations are of its members, and as well as the defendant's associations and understanding of how the enterprise operates. And so a juror could infer from John A. Brown's testimony, Enterprise Acts, each of these things. The enterprise existed and it operated for so long, was indeed, you know, an enterprise under the statute, and that the defendants were members of it and understood what the expectations were here, which is when you encounter disrespect in these sort of ways, you retaliate with violence. And from that, they could infer further that on the day of the murder, looking at completely separate evidence that came from Mr. Harrison and the video footage and everything else that the government presented, that these defendants, when they acted in the way that they did in murdering Mr. Simmons, were acting consistent with those expectations. And thus, they could further infer that, indeed, they had — that these defendants had possessed that by car purpose. And so to answer your question in brief, Your Honor, the government's perspective is that the district court gave a limiting instruction that I think was above and beyond what this court would require, but even with that instruction in place, the jury followed it. There's no evidence that the jury did not follow that, and the government was still able to prove each of the elements of the Vicar murder beyond a reasonable doubt. Now, again, the reason you think it's above and beyond is because the evidence is relevant to intent and purpose, even though it ordinarily, absent the Vicar context, would not come in for intent and purpose. In other words, for intent and purpose, you couldn't ordinarily put in evidence that Coates shot somebody years ago. But in this instance, in order to prove the enterprise crime, you could. Your Honor, in some — for 404b, there are some exceptions, and intent is one of them. And so, of course, there may be a situation in which a prior incident could be brought in under 404b. Here, the crime has what is not in most crimes. It has a motive element. That's what the Vicar purpose is. Improving motive, at least in this particular circumstance, requires proof of an entire set of elements in which bringing a prior, you know, act of conduct could essentially be proper if it survives a 403 test. And so that essentially is what that — what comes down — what it comes down to here. I think there's a 403 instruction, not a 404b instruction. Absolutely, Your Honor. I think there's a 404b problem, but the way that you figure out how you work around that is 403. You figure out whether or not the probative value here is or is not substantially outweighed by the danger of unfair prejudice, and not just prejudice, Your Honor. And so I think, really, the question is, was the evidence that was put before here, was the way that the district court limited all this evidence, did it invite the jury to essentially convict based off of these prior acts? And I don't think there's really any evidence that that occurred here. I think the district court was extremely limiting with its instruction, repeated that limiting instruction throughout trial, ensured that the jury understood it, but still permitted the government some limited ability to prove its enterprise case. We've taken you over your time. I want to see if our colleagues have questions for you. Okay. I'm going to ask you to just go ahead and briefly wrap up. Okay. Well, if there are no further questions, the government asks that this court affirm. Thank you. Thank you. Okay. So we'll have two rebuttals, and we'll hear first from Ms. Landau. Let's make sure two minutes are on. Yeah. Thank you. Well, I just have a few points. So I want to point out one of the things that the prosecutor said in discussing the evidence of implied malice and arguing that the jury's verdict should be construed to have, you know, that there's enough evidence, is that she herself said that, you know, that the defendants created a dangerous situation, but that's not the test. The act that the defendant commits has to create a high probability, to have a high probability of risk to life. It's not enough to create a dangerous situation. And that's a critical difference. So why couldn't a jury conclude it was a high probability when they went to retrieve firearms that they then used to confront somebody with? I think that, again, there's—well, again, first of all, my client didn't shoot anyone, so he has to be convicted on an aiding and abetting theory. And so you have to look at the act that he committed, which is he provided a gun and he went back to the scene. So that in itself may have increased the danger, but it didn't necessarily create a high probability of death. He didn't know Sean Harrison was going to shoot. That's not the standard. That didn't necessarily, right? I mean, to play it into her argument that the standard actually has to go the other way. We give the government the benefit of the doubt. I think here, again, and this is really—it's an argument of legal—I mean, what I'm making is an argument of legal insufficiency. I think legally that's just not enough. I think they have to show more. But what more would they need to show? Well, I think he could have said additional things other than— with the understanding that they're going to go back and face somebody. But they're going to go back, but you don't know that they're going to shoot. He knew that his cousin was a licensed firearms owner. I mean, when you look at the cases that this is decided in, there's always a lot more. You know, there's something where the defendant gives a gun to somebody who has a kind of a crazy person. Sean Harrison wasn't that. That's probably—you know, Sean Harrison was—he worked. He was licensed. There's always more, and there's just not that more here. And I understand your point, Your Honor, but that—here, that's lacking. I was going to— Go ahead and please continue. Yeah. The—what was this point? Oh, you know, I did just want to mention an express— there's clearly not enough for express malice. You really need more. You need an express intent to kill, and that's just lacking, especially since my client didn't shoot. And I think with that, I'll submit. Okay. Thank you very much, Ms. Landau and Ms. Richardson-Royer. My opponent argues that we have misapplied the legal standard and the sufficiency arguments, and that's not true. I am asking the Court to look at all of the admissible evidence on the issue of purpose and intent. And I specifically ask the Court to look at the limiting instructions and the district court's instructions to the jury at ER 1975 to 1976, 2882 to 2883, and 2009 to 2013. Those are the pages where the district court at length instructs the juries about what it cannot consider, and I ask the Court to put that evidence out of its mind when it looks at the sufficiency. So once again, my opposing counsel has argued that Johnny Brown's testimony would lead the jury to be able to infer that Mr. Manning and Mr. Coates thought that they had to retaliate because of an expectation, but Johnny Brown's testimony was inadmissible, and without it, the evidence is insufficient. I think that United States v. Banks is a really helpful case for us. The government pointed it out, but in that case, there was so much more than just a possible association or membership, which is all that we have in the admissible evidence. In that case, there was evidence that — lots of evidence about the expectations of gang members who were in that particular set of the crypts. There was evidence that — Sotomayor You're saying Johnny Brown's evidence was inadmissible because of the instruction that the district court gave? That's correct, Your Honor. And the specific — Not because you've also argued that it was just inadmissible. It should not have been admitted, but that's not what you're arguing. That's not the argument here. And the specific instruction given about Johnny Brown's testimony is at ER 2882 to 2883. And it simply was not admissible for this purpose. And so in Banks, there was evidence that the defendant's girlfriend had mocked him for not retaliating in the past and told him, you know, what kind of crip are you? There's nothing like that here. So Banks really undercuts the insufficiency of the evidence here. And then just quickly on bifurcation, there's the concern about the government's rights to present its case and the government's ability to present everything at once. The concern historically about special verdicts and special interrogatories is to protect the defendant's rights. And I don't think that the government's right to present the case in the way that it wants should somehow be prioritized over the right of a criminal defendant to be free from this incredibly prejudicial evidence that is necessary in these VICAR prosecutions. VICAR is a unique statute. Bifurcation may only be appropriate in VICAR cases. In order to agree with you, do we have to disagree with the government and maybe with you that this, that the district court did not have, actually have to exclude this evidence from consideration with regard to the murder? In other words, the government's position was that the limiting instruction was overkill and that there was no reason for it. Do we have to decide that in order to agree with you? No, Your Honor, no. But the court could decide in any case to bifurcate without giving that limiting instruction. And you don't have to decide whether, you know, there's no allegation that that was an abuse of discretion. That issue was not before the court. Did that answer your question? I'm not sure I understood it properly. Let me see if there's further questions for you. I know we've taken you over. Okay. I want to thank you, Ms. Richardson-Royer, Ms. Landau, Ms. Sheehy. Thank you very much for your presentations this morning. This matter is submitted, and the court will stand in recess until tomorrow morning. All rise.
judges: BERZON, BRESS, VANDYKE